# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT TACOMA

| | |
|---|---|
| MARK D. KLEINSASSER,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>PROGRESSIVE DIRECT INSURANCE COMPANY, et al.,<br><br>　　　　　Defendants. | CASE NO. C17-5499 BHS<br><br>ORDER REQUIRING AN EVIDENTIARY HEARING AND REQUESTING ADDITIONAL RESPONSES |

This matter comes before the Court on Plaintiff Mark Kleinsasser's ("Plaintiff") motion to remand (Dkt. 14). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby rules as follows:

## I.　PROCEDURAL HISTORY

On April 1, 2016, Plaintiff filed a class action complaint against Defendants Progressive Direct Insurance Company and Progressive Max Insurance Company (collectively, "Progressive") in Pierce County Superior Court for the State of Washington. Dkt. 1-2 ("Comp."). Plaintiff seeks to recover diminished value on a class-wide basis and individual loss of use damages under the Underinsured Motorists Property

Damage ("UIM") provision of his insurance contract with Progressive. *Id*. Plaintiff alleged that the total amount of compensatory damages would be "approximately $3,010,903." *Id*.

On June 28, 2017, Progressive removed the matter to this Court. Dkt. 1.

On July 28, 2017, Plaintiff filed a motion to remand challenging both the timing of the removal and Progressive's calculation of damages. Dkt. 14. On August 28, 2017, Progressive responded. Dkt. 24. On September 1, 2017, Plaintiff replied. Dkt. 29.

## II. FACTUAL BACKGROUND

On September 18, 2015, an uninsured driver hit Plaintiff's vehicle causing significant damage. Comp., ¶ 1.8. The vehicle was towed to a repair shop, and Plaintiff submitted a claim to Progressive. *Id*. ¶ 6.7. Plaintiff was without the use of his vehicle until November 24, 2015, and, on two separate occasions, he returned the vehicle to the repair shop for additional repairs. *Id*. ¶ 1.9. Plaintiff alleges that Progressive failed to provide him with a rental car or otherwise reimburse him for the loss of use of his vehicle. *Id*. ¶¶ 6.7, 6.11. Plaintiff also alleges that Progressive failed to compensate him for the diminished value of his vehicle. *Id*. ¶¶ 6.2–6.5.

Plaintiff claims that Progressive's failure to compensate its insured for diminished value has been "systematic and continuous" and has affected a large number of insureds over time. *Id*. ¶ 5.1. As such, Plaintiff seeks certification of a class as follows:

> All PROGRESSIVE insureds with Washington policies issued in Washington State, where the insured's vehicle damages were covered under Underinsured Motorist coverage, and
> 1. the repair estimates on the vehicle (including any supplements) totaled at least $1,000; and

    2. the vehicle was no more than six years old (model year plus five years) and had less than 90,000 miles on it at the time of the accident; and
    3. the vehicle suffered structural (frame) damage and/or deformed sheet metal and/or required body or paint work.
    Excluded from the Class are (a) claims involving leased vehicles or total losses, and (b) the assigned Judge, the Judge's staff and family.

*Id.*, ¶ 5.3. Plaintiff alleged that "the total amount sought in compensatory damages in this action will be approximately $3,010,903," based on "approximately 2107 claims" and "$1429 per claim on average as the average damages recoverable." *Id.* ¶ 2.5.

  On June 28, 2017, Progressive removed the matter to federal court asserting that the Court has jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). Dkt. 1. Progressive conducted an independent search of its database and concluded that the total amount of damages exceeds $5,000,000, which is the jurisdictional minimum for CAFA jurisdiction. *Id.* ¶¶ 19–31. Progressive submitted two declarations in support of this calculation. Frist, Michael Silver, a master data analyst for Progressive, conducted a review of Progressive's records. Dkt. 2, Declaration of Michael Silver ("Silver Decl."), ¶¶ 1, 3. Mr. Silver constructed search criteria that matched his understanding of Plaintiff's class definition and "identified 3,814 claims that fit the search criteria." *Id.* ¶ 8. Mr. Silver, however, "was unable to eliminate claims involving leased vehicles from the proposed class through electronic searches because Progressive does not regularly record this information as part of its claims data." *Id.* ¶ 9.

  Second, Kevin Rehkme, a claims supervisor for Progressive, conducted a manual inspection of Progressive's claim files in order to determine the proportion of leased vehicles within the claims identified by Mr. Silver. Dkt. 3, Declaration of Kevin

Rehkme, ¶¶ 1, 4.  Mr. Rehhkme declares that he did not review a sample of claims within the proposed class because "insureds do not always inform Progressive when they purchase a vehicle they had previously been leasing." *Id*. ¶ 4.  Instead, Mr. Rehkme reviewed a sample of claims wherein the vehicle was a total loss. *Id*. ¶ 5.  In total-loss claims, he "could identify whether the vehicle was leased or owned by identifying total loss payments to lienholders and then reviewing the claims notes." *Id*. ¶ 7.  Upon review of 172 total-loss claims, he found that ten claims involved leased vehicles or 5.8%. *Id*. ¶ 10.  Mr. Rehkme concluded that it is reasonable to assume that 5.8% of the claims identified by Mr. Silver should be excluded from the class list. *Id*. ¶ 11.

On July 28, 2017, Plaintiff moved to remand challenging Progressive's assertion that CAFA jurisdiction existed and submitted evidence in support of its position.[1] Plaintiff's expert, Dr. Bernard Siskin, reviewed Mr. Silver and Mr. Rehkme's declarations and claims that they made two specific errors as follows:

> a. Remove all vehicles that have only non-Class related damage (such as to lights, chrome bumpers, etc., i.e., damage that is not to frame/structure and/or body/paint);
> b. Accurately determine the percentage of leased vehicles because they have used as a starting point a biased and improper sample which dramatically understates the percentage of leased vehicles.

Dkt. 14-1 at 7–14, Declaration of Bernard Siskin ("Siskin Decl."), ¶¶ 4–5.  After explaining why Mr. Rehkme's assumptions and analysis were flawed, Dr. Siskin concludes as follows:

---

[1] Although Plaintiff attempted to submit three exhibits under seal, the Court is unable to locate these documents in the record.  Plaintiff filed placeholders for the exhibits, *see* Dkts. 14-1, 14-2, 14-3, but failed to actually file the documents on the record under seal.

> If I apply the expected percentage (9.5%) based upon lease rates in Washington, the Class Size would be 3,452 claims [3,814 claims x 90.5%] which would be $4,932,908 in damages at $1,429/claim.
> If I apply the percentage I have derived from Mr. Rehmke's flawed sample (by adjusting the population to account for his under sampling of leased vehicles) of 10.3%, the Class size would be 3,421 claims [3,814 claims x 89.7%] which would be $4,888,609.
> If I apply the percentage inflation in the lease rate in the class compared to that among non class damaged cars (3.36*5.8% or 19.5%), the Class size would be 3,070 claims [3,814 claims x .80.5%] which would be $4,387,030.

*Id.* ¶¶ 13–15.

Dr. Siskin then discusses flaws in Mr. Silver's analysis. Mr. Silver assumed that "vehicles with repair estimates of at least $1,000 would have sustained either structural damage, deformed sheet metal, and/or required body or paint work." Silver Decl., ¶ 6. Dr. Siskin contends that this assumption is flawed because, based on data from a previous diminished value case, "accidents with over $1,000 in damages can result from damages to only replaceable parts that do not require painting (such as lights, grills, chrome bumpers, etc.), and these type of accidents are not uncommon." Siskin Decl., ¶ 16. For example, a headlight assembly for a 2016 Honda Accord has a list price of $1,140.87. *Id.* n.5. Accounting for these claims, Dr. Siskin further reduced Progressive proposed class size by concluding as follows:

> [T]he actual class size would be 3,372 (using the 9.5% figure for leased vehicles) or 3,372 (using the 10.3% figure I have derived from Mr. Rehmke's under-sampled sample) or 2,999 (using the 19.5% figure based on Allstate data on the relationship between the lease rate of class vehicles and non-class damaged vehicles). This would be respectively $4,818,588 (using 9.5% leased vehicles) or $4,77,718 [sic] (using 10.3% leased vehicles) in damages or $4,285,571 (using the 19.5% leased rate).

*Id.* ¶ 18.

ORDER - 5

In response, Progressive employed an expert, Dr. Michael Salve, who pointed out flaws in Dr. Siskin's work and provided other conclusions. Dkt. 27, Declaration of Dr. Michael Salve. First, Dr. Salve declares that

> [a]side from the obvious fact that [Dr. Siskin's] estimates vary by a factor of more than 100% and that Dr. Siskin has not stated which estimate he thinks is correct, I find that the calculation methodologies that underlie all three of these estimates are deficient and misleading and that the estimates themselves are unreliable.

*Id.* ¶ 8. The errors are based on a misinterpretation of a leading car publication, a deficient and misleading attempt to correct for bias in Mr. Rehmke's work, and an unsupported comparison of vehicle lease rates from Dr. Siskin's work in an earlier Allstate case. *Id.* ¶ 9–15.

Second, Dr. Salve concluded that the average claim would be $1,854.08. *Id.* ¶ 20. Dr. Salve based this number on Dr. Siskin's average claim amount in the older Allstate matter, which was $1,386.87, and increased it proportional to the average increase in retail selling prices for cars during the time period between the older case and this case. *Id.* ¶¶ 16–19.

In reply, Plaintiff submits additional evidence from Dr. Siskin and Darrell Harber, a professional in the auto and auto repair industry. Dr. Siskin declares that Dr. Salve made numerous errors in his critique and in his conclusions. Dkt. 30 at ¶¶ 5–13. Dr. Siskin also declares that, in a similar diminished value case, he applied his statistical model for damages to an actual sample and determined that damages were "$590.96 per claim." *Id.* ¶ 16.

Mr. Harber declares that he provides actual diminished value estimates for customers. Dkt. 31, Declaration of Darrell Harber, ¶¶ 4–5. Mr. Harber claims that most insurers reject smaller diminished value claims outright, but will pay claims for higher amounts. *Id.* ¶ 7. Thus, Mr. Rehmke's sample based on diminished value claims that were paid is "highly misleading" because the proposed class consists of insureds with smaller, rejected claims. *Id.* ¶ 8.

### III. DISCUSSION

In this case, Plaintiff moves to remand based on the amount in controversy and the timing of the removal. The Court will address both issues.

**A. Amount in Controversy**

"A defendant generally may remove a civil action if a federal district court would have original jurisdiction over the action." *Allen v. Boeing Co.*, 784 F.3d 625, 628 (9th Cir. 2015). CAFA vests federal district courts with original jurisdiction over class actions involving more than 100 class members, minimal diversity, and at least $5,000,000 in controversy, exclusive of interests and costs. *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 552 (2014) (citing 28 U.S.C. § 1332(d)). A defendant seeking removal under CAFA must file a notice of removal "containing a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee*, 135 S. Ct. at 551.

The burden of establishing removal jurisdiction remains on the party seeking removal. *Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 685 (9th Cir. 2006). "When, as here, 'a defendant's assertion of the amount in controversy is challenged . . .

both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied.'" *LaCross v. Knight Transp. Inc.*, 775 F.3d 1200, 1202 (9th Cir. 2015) (quoting *Dart Cherokee*, 135 S.Ct. at 554)). "The parties may submit evidence outside the complaint, including affidavits or declarations, or other 'summary-judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Ibarra v. Manheim Investments, Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2015) (quoting *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997)). Then "the district court must make findings of jurisdictional fact to which the preponderance standard applies." *Dart Cherokee*, 135 S. Ct. at 554 (citing H.R.Rep. No. 112–10, p. 16 (2011)). "[W]hen the defendant relies on a chain of reasoning that includes assumptions to satisfy its burden of proof, the chain of reasoning and its underlying assumptions must be reasonable ones." *LaCross*, 775 F.3d at 1202 (9th Cir. 2015) (citing *Ibarra*, 775 F.3d. at 1199). "Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." *Id*. at 1199.

In this case, the parties contest the potential size of the class, the average amount of each potential claim, and the amount of awardable attorney's fees. Regarding the potential class size, the parties have created a battle of experts and lay witnesses requiring findings of fact. Both parties start with a proposed class size of 3,567 based on a list produced by Progressive. Dkt. 24 at 4 n.2; Dkt. 32-1 at 1. Then the parties extrapolate to exclude the potential number of leased vehicles within that group. The extrapolations are based on underlying facts and assumptions. When the facts are established, Progressive

bears the burden to show that the "chain of reasoning and its underlying assumptions" are reasonable. *LaCross*, 775 F.3d at 1202. Therefore, the Court will schedule an evidentiary hearing on the matter to resolve the conflicting facts.

Regarding the amount of each claim, the parties have also created a battle of witnesses requiring findings of fact. This battle, however, seems more relevant to the amount in controversy than class size due to the wide variance in the estimated amounts. Based on the current record, the spectrum of average potential individual damages ranges from $590.96 to $1,854.08. If the Court adopts either one of these extremes, then the potential number of claims appears to be immaterial.[2] As such, it is curious that both parties rely on assumptions and speculation when actual numbers seem attainable. For example, each party could pick ten potential class members, submit the claims to an independent assessor, like Mr. Harber, and have the assessor return twenty estimates to produce an actual number representing an average claim amount. Of course an extrapolation would still be necessary to reach an amount representing the amount in controversy, but the chain of reasoning and underlying assumptions would be based on this class instead of other data. The parties have invested so much time, effort, and expense into disputing hypothetical class sizes and amounts that actual underlying evidence may be warranted. Regardless, the Court will also set this matter for hearing to resolve the factual disputes.

---

[2] Back-of-the-envelope calculation.

Finally, with regard to attorney's fees, the parties dispute an unresolved question of law. In the complaint, Plaintiff alleges that he "and the members of the proposed Class are entitled to . . . statutory attorney's fee allowed by RCW 4.84.015 ($200.00)." Comp. ¶ 7.1(c). Progressive contends that if Plaintiff "seeks to recover $200 for each class member, that would result in an additional $718,557.60 of damages." Dkt. 1, ¶ 31. In the motion to remand, Plaintiff argues that this is a meritless throw-away argument. Dkt. 14 at 12. Progressive responds with a paragraph of its own. Dkt. 24 at 11–12. Because resolution of the facts regarding potential class size and potential claim amount could result in a conclusion that the amount in controversy is between approximately $4,300,000 and $5,000,000, resolution of this $700,000 potential award could be relevant to the ultimate conclusion. As such, the parties have inadequately briefed the issue. Therefore, the Court requests additional briefing on this issue.

**B.     Timing**

Plaintiff argues that Progressive's removal was untimely. Dkt. 14 at 13. The Court will not engage in a lengthy analysis of this issue because this is a preliminary order and because Plaintiff's counsel has repeatedly made the same argument to this Court in numerous cases. It is black letter Ninth Circuit law that a defendant's subjective knowledge regarding the potential amount in controversy does not trigger the second thirty-day removal period. *Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1126 (9th Cir. 2013) ("we are inclined to think that the sentence should be understood in context to mean only that a 'defendant's subjective knowledge cannot convert a non-removable action into a removable one'"). Giving defendant step-by-step instructions on

how to search its database to determine the potential amount in controversy seems irrelevant whether a defendant acts or fails to act because, at most, acting will result in defendant's subjective knowledge of the potential class size. Applied to this case, Plaintiff's argument that Progressive's "counsel had plenty of occasion to inquire reasonably of Progressive how its claims data reflects on the accuracy of class size estimate alleged by Plaintiff in his Complaint without the benefit of discovery" is irrelevant. Absent any evidence of objective knowledge, the Court may be easily dispose of this argument.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that the parties shall meet and confer and then submit a briefing schedule, including a deadline for proposed findings of fact, and a proposed hearing date. The parties shall file the proposed schedule no later than October 20, 2017.

Dated this 10th day of October, 2017.

BENJAMIN H. SETTLE
United States District Judge