UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARK D. KLEINSASSER,<br><br>    Plaintiff,<br><br> v.<br><br>PROGRESSIVE DIRECT INSURANCE COMPANY, et al.<br><br>    Defendants. | CASE NO. C17-5499 BHS<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendants Progressive Direct Insurance Company and Progressive Max Insurance Company's (collectively "Progressive") motion for summary judgment. Dkt. 194. The Court has considered the motion and the briefs filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On April 1, 2016, Plaintiff Mark D. Kleinsasser filed a class action complaint against Progressive in Pierce County Superior Court for the State of Washington. Dkt. 1-2. Kleinsasser sought to recover diminished value on a class-wide basis and individual loss of use damages under the Underinsured Motorists Property Damage provisions of his

insurance contract. *Id*. On June 28, 2017, Defendants removed the matter to federal court. Dkt. 1. On June 21, 2019, the Court denied Kleinsasser's motion to certify. Dkt. 131. On May 6, 2020, the Court granted in part Kleinsasser's motion for partial summary judgment as to the existence of a valid contract that covered damages caused by an uninsured motorist and as to the availability of diminished value under the specific language of the insurance contract. Dkt. 162.

On December 23, 2020, the Court granted Progressive's motion to amend to add a material misrepresentation affirmative defense. Dkt. 182. On January 7, 2021, Progressive filed the instant motion for summary judgment. Dkt. 186. On March 8, 2021, Kleinsasser responded. Dkt. 192. On March 12, 2021, Progressive replied. Dkt. 194.

## II. FACTUAL BACKGROUND

On September 18, 2015, an uninsured driver hit Kleinsasser's 2015 Ford F150 truck causing significant damage. Dkt. 1-2, ¶ 1.8. Kleinsasser had purchased insurance coverage with Progressive Direct. Dkt. 98 at 2. The truck was towed to a repair shop, and Kleinsasser submitted a claim to Progressive Direct. Dkt. 1-2, ¶ 6.7. Kleinsasser could not use his truck until November 24, 2015, and, on two subsequent occasions, returned the truck to the repair shop for additional repairs. *Id*., ¶ 1.9. He alleges that he properly presented the truck to Progressive Direct to have the loss adjusted and paid, but Progressive Direct did not adjust the loss to include diminished value loss. *Id*., ¶¶ 1.11–.12.

On March 6, 2016, Kleinsasser's expert Darrell M. Harber evaluated the diminished value loss to the truck. Dkt. 147-1. He concluded that the truck lost $7,375 in

actual cash value as a result of the collision. *Id*. at 10. Kleinsasser filed suit on April 1, 2016. Dkt. 1-2.

While litigation was ongoing, Kleinsasser attempted to trade in the truck at local dealerships, including Fugate Ford. *See* Dkt. 180 at 16, 18. On November 20, 2019, Shane McNeill, an employee at Fugate Ford, emailed Kleinsasser a letter stating that Fugate was not interested in trading in the truck due to previous structural damage from the accident ("the Fugate letter"). Dkt. 167-1. The letter reads:

> To whom it may concern:
>
> The 2015 Ford F-150 with VIN: IFTEWIEF3FFB09095 is a truck we would not be interested in by means of a trade-in or purchase. Due to previous structural damage, from an accident, it is not a vehicle that we would want in our inventory. Thank you for your time.

*Id*.

The email had no subject line or body text and included an image of the handwritten letter as an attachment. Dkt. 180 at 21.

Kleinsasser shared the letter with his counsel, who provided it to Progressive in discovery on December 4, 2019. Dkt. 167, ¶ 3. In January 2020, Kleinsasser traded in his truck at Fugate Ford. Dkt. 177 at 2; Dkt. 179 at 4. The trade-in price was $20,000, and Fugate sold it five days later on the retail lot for $28,500 (without having conducted any additional repair). Dkt. 178-2 at 11.

In July 2020, Harber updated his expert report, addressing the trade-in, and Kleinsasser's counsel provided the report to Progressive. Dkt. 167, ¶ 4; Dkt. 180 at 5–10. Harber opined that the value paid on a trade-in may operate as a "double check" of the
ORDER - 3

accuracy of his opinion, but in this case the value was further evidence supporting his opinions and "suggests that my estimate was if anything conservative (i.e. on the low end)." Dkt. 167-2, ¶¶ 6, 9. Progressive argues this is the first time it learned Kleinsasser's vehicle had been traded in. Dkt. 177 at 5.

When asked whether he told McNeill what he wanted the letter to say, Kleinsasser testified:

> I - - I - - I basically had been frustrated. I had gone to two other dealerships. Nobody wanted to give me a fair trade for my car, and I asked [McNeill] to send something showing that I - - I could not get full trade value for my vehicle, and this is the letter that he wrote.

Dkt. 187-1 at 4–5. He specified:

> I got tired of Progressive waiting to do the right thing, and I actively bought [sic] a couple dealerships to see if I could get a trade in on the car. And I went back to Shayne and I said, Hey, listen, you know, nobody wants to give me a fair trade on this car. Can you send me a document? Because of the diminished value.

*Id*. at 6.

Kleinsasser explained that the dealerships, including Fugate Ford, told him that they would not trade in the truck for full value—that if he traded it in, he would need to "be willing to take a hit in the loss if they were to deal with it, and it was conveyed to me that more than likely they would wholesale the vehicle." *Id*. at 11–15.

McNeill testified that he wrote the letter because "I had a customer who was having problems, to my knowledge, of getting his full amount from the damages of his vehicle. And he kind of laid out what would help get that value, what he wanted me to write. And I wrote it." Dkt. 178-1 at 8. He testified that he knew Fugate Ford had taken in

vehicles with structural damage and agreed that "reading the letter the way it's written is false." *Id*. at 14–15. He stated that "I wouldn't write a letter in a way that I thought was false. I don't know why I wrote it that way." *Id*. at 15.

### III. DISCUSSION

Progressive contends that the Fugate letter is a material misrepresentation voiding coverage under the policy—specifically, that Kleinsasser asked McNeil to write a false letter to inflate the value of his claim with Progressive. Kleinsasser counters that: (1) the misrepresentation provision in the policy does not apply after litigation begins; (2) any misrepresentation was not material; (3) Progressive did not rely on the Fugate letter; and (4) the Fugate letter was truthful when written, not ghostwritten by Kleinsasser, and does not constitute a false statement during the claims process.

**A.** **Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").

Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.     Analysis**

Kleinsasser argues that the policy's Fraud or Misrepresentation provision does not apply to his conduct, and even if it does apply, there is at least a dispute of fact about whether he made any materially false representations. While the insured has the burden of proving that claims fall within a grant of coverage, the insurer has the burden of proving that an exclusion bars coverage. *See McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 731 (1992).

### 1. Policy Interpretation

First, the Court considers Kleinsasser's contention that the Fraud and Misrepresentation provision Progressive invokes does not extend to conduct during litigation. This contention is not persuasive.

Washington courts interpret insurance contracts by giving them a "fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Weyerhaeuser Co. v. Commercial Union Ins.*, 142 Wn.2d 654, 670 (2000) (quoting *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 134 Wn.2d 413, 427 (1998)). An "[i]nsurance contract should be given a practical and reasonable, rather than a literal, interpretation, and should not be given a construction which would lead to an absurd conclusion or render the policy nonsensical or ineffective." *Wash. Pub. Util. Dist. Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam Cnty.*, 112 Wn.2d 1, 11 (1989).

"Undefined terms in an insurance contract are given 'plain, ordinary, and popular meaning' as set forth in standard English language dictionaries." *Overton v. Consolidated Ins. Co.*, 145 Wn.2d 417, 428 (2002) (quoting *Boeing Co. v. Aetna Cas & Sur. Co.*, 113 Wn.3d 869, 877 (1990)). Terms should give given consistent meaning throughout a contract. *Weyerhaeuser*, 142 Wn.2d at 670 ("In the absence of anything in the context of a contract clearly indicating a contrary intent, when the same word is used in different parts of the contract, it will be presumed to be used in the same sense throughout the contract." (quoting *Holter v. Nat'l Union Fire Ins. Co.*, 1 Wn. App. 46, 50 (1969))). "'If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists.'" *Weyerhaeuser*, 142 Wn.2d at 666

(quoting *B & L Trucking & Constr. Co.*, 134 Wn.2d at 427–28). "Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable.'" *Id*. (quoting *B & L Trucking & Constr. Co.*, 134 Wn.2d at 427–28). "The rule that ambiguous contract language is to be construed in favor of the insured and most strongly against the insurer should not be permitted to have the effect of making a plain agreement ambiguous." *Ohio Cas. Ins. Co. v. Chugach Support Servs., Inc.*, No. C10-5244RBL, 2011 WL 4712234, at *3 (W.D. Wash. Oct. 6, 2011) (citing *McAllister v. Agora Syndicate, Inc.*, 103 Wn. App. 106, 110 (2000)).

The policy's FRAUD OR MISREPRESENTATION provision provides that:

> **We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, with the intent to deceive in connection with the presentation or settlement of a claim.

Dkt. 178-3 at 33 (emphasis in original).

Kleinsasser argues that neither the ordinary meaning of the word "claim" nor its dictionary definition encompasses conduct during litigation. While this Court has stated that Washington courts uphold "policy provisions stating that misrepresentation, concealment, or fraud in the *claims process* will void coverage," *Reverse Now VII, LLC v. Or. Mut. Ins. Co.*, 341 F. Supp. 3d 1233, 1237 (W.D. Wash. 2018) (emphasis added) (collecting cases), it has also cited a statement in deposition as a potential instance of misrepresentation, *Glamuzina v. Glens Falls Ins. Co.*, No. C07-5011 FDB, 2008 WL

2485572, at *2 (W.D. Wash. June 17, 2008). Neither authority, nor any of the parties' other cited authority, considers the duration of the insured's obligation under a fraud or misrepresentation clause.

Kleinsasser argues that the policy uses the term claim in a number of places to refer to pre-litigation processes, and cites the *Merriam-Webster Dictionary* definition of claim, which includes "claim" as a transitive verb defined as "to ask for especially as a right," and as a noun defined as "a demand for something due or believed to be due." Dkt. 192 at 13 (citing https://www.merriam-webster.com/dicionary/claim). These definitions do not preclude a claim continuing into litigation—the complaint asks for what he believes to be due. Kleinsasser's strongest arguments are premised on the fact that the policy's cooperation clause uses the terms "claim" and "lawsuit" in the alternative. *Id.* at 15. He argues that the terms must have different meanings and that "claims process" ends when litigation begins.

The policy's cooperation clause provides that a person seeking coverage must "cooperate with **us** in any matter concerning a claim or lawsuit" and "promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit." Dkt. 178-3 at 30. He cites Progressive's corporate representative's testimony that once a complaint is filed, a claim is transferred from the claims department to the corporate litigation group and the litigation group would typically handle the matter from that point forward, arguing the transfer demonstrates that the matter is no longer proceeding "in connection with the presentation or settlement of a claim." Dkt. 192 at 12 (citing Dkt. 193 at 5). He also contends that construing the word "claim" in the

Fraud or Misrepresentation clause violates the rule that a word should be construed to have the same meaning throughout an insurance policy. *Id*. at 15 (citing *Weyerhaeuser*, 142 Wn.2d at 670).

Ultimately, these arguments are unpersuasive. Kleinsasser filed a claim with Progressive, Progressive did not adjust the loss, "and to-date Progressive has never valued Mr. Kleinsasser's diminished value or made any offer to pay this loss under the policy." *Id*. He seeks damages only in the amount of the diminished value he alleges he is owed under the policy. Dkt. 192 at 4. To find a clause ambiguous and thus construe the ambiguity against the drafter, the Court must conclude that the clause is "'fairly susceptible to two different interpretations, both of which are reasonable.'" *Weyerhaeuser*, 142 Wn.2d at 666 (quoting *B & L Trucking*, 134 Wn.2d at 427–28).

Kleinsasser's interpretation would read the phrase "in connection with" out of the policy. A reasonable person purchasing insurance would not conclude that they were relieved of their contractual duty to refrain from concealing or misrepresenting material facts or circumstances because they sued to compel the insurance company to pay the value of their claim. A reasonable person would not conclude that they could provide misleading material to the insurance company simply because it would pass through their lawyer rather than directly to the insurer. As the Court concludes Kleinsasser has not put forward a reasonable interpretation of the provision, it does not find ambiguity and does not construe the clause against Progressive. Therefore, the clause applies to Kleinsasser's conduct, and the Court turns to evaluate whether that conduct voids coverage.

## 2. Policy Application

### a. Materiality

Washington courts uphold void-for-fraud or misrepresentation provisions "'regardless of whether the misstatements prejudiced the insurance company,' and '[a]n insured need only make one material misrepresentation to void all coverage under the entire policy.'" *Reverse Now VII, LLC v. Or. Mut. Ins. Co.*, 341 F. Supp. 3d 1233, 1237 (W.D. Wash. 2018) (quoting *Ki Sin Kim v. Allstate Ins. Co., Inc.*, 153 Wn. App. 339, 355 (2009)). "'A misrepresentation is material if it involves a fact that is relevant to the claim or the investigation of a claim.'" *Id.* (quoting *Onyon v. Truck Ins. Exch.*, 859 F. Supp. 1338, 1341 (W.D. Wash. 1994)). "Materiality is determined from the standpoint of the insurer, not the insured." *Kim*, 153 Wn. App. at 355 (citing *Onyon*, 859 F. Supp. at 1342). "[A] misrepresentation is material if, *when made*, it *could have* affected the insurer's investigation." *Allstate Ins. Co. v. Huston*, 123 Wn. App. 530, 540 (2004) (emphasis in original). "While materiality is 'generally a mixed question of law and fact,' it may be decided as a matter of law 'if reasonable minds could not differ on the question.'" *Reverse Now*, 341 F. Supp. 3d at 1237 (quoting *Onyon*, 859 F. Supp. at 1341).

Progressive correctly asserts that because it does not have to demonstrate prejudice, what did or did not occur once Progressive received the Fugate letter is immaterial. Instead, the question is whether the misrepresentation could have affected its investigation. *Allstate*, 123 Wn. App. at 540.

Kleinsasser argues that the letter could not have influenced Progressive's valuation of his truck's diminished value because Washington law requires that a valuation is

determined as of the date or time of loss. Dkt. 192 at 5, 22–23 (citing *Langley v. GEICO Gen. Ins. Co.*, No. 114–CV–3069–SMJ, 2015 WL 1611120 (E.D. Wash. Apr. 15, 2015), *vacated in part on other grounds on reconsideration*, 2015 WL 3402895 (E.D. Wash. May 26, 2015)). However, this authority does not establish, and it is not the case (as demonstrated by Kleinsasser's expert's supplemental report/disclosure), that the later sale potential of a vehicle has no relevance to the diminished value it experienced as of the date of loss. While Kleinsasser's expert did not find that the Fugate letter changed his valuation of the loss, his supplemental "report/disclosure" concluded that the trade-in value "provides further evidence supporting my opinions as to the amount of diminished value suffered on the vehicle at the time of loss." Dkt. 180 at 9. He declares that the trade-in value of vehicles "is not directly reflective of the amount of diminished value following repair," though "[i]t is, however, sometimes useful to look at later transactions, provided one adjusts for depreciation . . . . At most, it is a figure which may be in certain situations considered as part of my assessment as a 'double check' against the accuracy of the assessment." Dkt. 180 at 7–8. Therefore, the letter's contention that the truck had *no* trade-in value is certainly relevant to and *could have* affected Progressive's assessment of the diminished value the truck experienced. *Reverse Now VII*, 341 F. Supp. 3d at 1237; *Allstate*, 123 Wn. App. at 540.[1]

---

[1] The Court notes that the apparent withholding of the fact of the trade-in from January 2020 through the updated expert report in July 2020 would appear to violate Rule 26 obligations and could also constitute a material misrepresentation by omission.

Kleinsasser also raises the issue of Progressive's use of the word "may"—that it "may deny coverage" as a result of a material misrepresentation, not that it will deny coverage. Dkt. 192 at 16. He is correct that the Washington Court of Appeals in *Kim* found a question of fact on materiality when a policy used this "equivocal" language, *id.* (citing *Kim*, 153 Wn. App. at 346), but he is not correct that the circumstances the Court of Appeals found meaningful in *Kim* are present in this case.

The plaintiff in *Kim* did not dispute that she misrepresented her ability to work and the nature and extent of her injuries following her visit to the emergency room, but argued that her misrepresentations were not material because her wage loss claims were collateral to her primary claim for reimbursement for emergency room bills. 153 Wn. App. at 357–58. The Court of Appeals concluded that because there was no evidence that she misrepresented anything regarding her emergency room visit and because the word "may" made it "unclear under which circumstances [the insurer] will deny coverage and to what extent its obligation is relieved by misrepresentations," the insurer's obligation to cover the cost of the emergency room visit was an open question for remand. *Id.* at 360–61. However, as the record clearly demonstrated knowing and intentional misrepresentations about the post-emergency room claims, the insurer was relieved of its obligation on those claims. *Id.* at 361.

Here, the same discrepancy is not present. The misrepresentation pertains to the only claim at issue—the diminished value of the truck. Therefore, as reasonable minds could not differ on materiality, the Court concludes that Progressive has demonstrated materiality as a matter of law. *Onyon*, 859 F. Supp. at 1341.

ORDER - 13

### b. Falsity and Intent

"In order to avoid liability based on a material misrepresentation, the insurance company must demonstrate that the insured knowingly made the untrue representation and that, in making those representations, the applicant intended to deceive the company." *Kim*, 153 Wn. App. at 355 (citing *Kay v. Occidental Life Ins. Co.*, 28 Wn.2d 300, 301 (1947)). "If the insured knowingly made a false statement, the burden shifts to the insured to establish an honest motive or an innocent intent." *Id*. at 355–56 (citing *Kay*, 28 Wn.2d at 302). "[I]n the absence of credible evidence of good faith, the presumption warrants a finding in favor of the insurance company." *Id*. at 356 (citing *Kay*, 28 Wn.2d at 302).

As noted in the Court's prior Order granting leave to amend, there is a dispute of fact about whether Kleinsasser was present when the letter was drafted and whether Kleinsasser or McNeill came up with what the letter should say. Dkt. 182 at 3. However, this factual dispute is not material.

The testimony demonstrates both that Kleinsasser intended the letter to influence his claim and that it was false—it did not reflect what Kleinsasser knew to be true about his truck's trade-in potential. The letter says the dealership would not trade in or purchase Kleinsasser's truck. This is not what he knew to be true—instead, he knew the dealerships would not give him what he considered a fair trade. Dkt. 187-1 at 4–5 ("I said, Hey, listen, you know, nobody wants to give me a fair trade on this car. Can you send me a document?"). He contends that what he asked for was a document showing "that the - - the car does have diminished value when I tried to trade it in." *Id*. at 7. That

is not what the letter reflects. Upon receiving this inaccurate letter, Kleinsasser took no action to have it revised or otherwise ensure Progressive received accurate information. Instead, he gave the letter to his counsel to provide to Progressive in discovery. Therefore, the burden shifts to him to establish an honest motive or innocent intent. *Kim*, 153 Wn. App. at 355. He does not meet this burden.

Kleinsasser's explanation of his innocent intent appears to be his contention that the letter was true at the time it was written—that at some point in the fall of 2019, Fugate Ford was not interested in trading in or purchasing his truck. However, that is not what Kleinsasser's testimony reflects that he knew to be true. Kleinsasser has thus failed to rebut the presumption that he intended to deceive Progressive. *Reverse Now*, 341 F. Supp. 3d at 1237.

The Court concludes that Progressive has therefore established an absence of disputed facts on each element of its material misrepresentation defense. Therefore, the Fraud and Misrepresentation Clause is applicable. Progressive appropriately invokes it as an affirmative defense precluding coverage and is entitled to judgment as a matter of law.

# IV.  ORDER

Therefore, it is hereby **ORDERED** that Progressive's motion for summary judgment, Dkt. 194, is **GRANTED**.

The Clerk shall enter a **JUDGMENT** and close the case.

Dated this 30th day of April, 2021.

*[signature]*

BENJAMIN H. SETTLE
United States District Judge